UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549

                                        Plaintiff,

    v.                                                          Civil Case No. _____

CAROLE ARGO,
209 East Highfield Road
Baltimore, MD 21218
                                        Defendant.

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), alleges for its Complaint, as follows:

## SUMMARY OF ALLEGATIONS

1.      From at least the fourth quarter 2000 through the fourth quarter of 2005, defendant Carole D. Argo ("Argo") formerly the president, chief operating officer ("COO") and chief financial officer ("CFO") of SafeNet, Inc. ("SafeNet" or the "Company"), participated in a fraudulent scheme to backdate option grants to take advantage of low points in the Company's stock price, without causing SafeNet to record a compensation expense for those option grants, as required by Generally Accepted Accounting Principles ("GAAP"). As a direct result of this backdating scheme Argo caused SafeNet to report materially misstated financial results for at least the period from the fourth quarter of 2000 through the second quarter of 2006.

2.    In furtherance of the scheme, Argo routinely looked back and selected historical dates when SafeNet's stock price had closed at or near the low for a given period to use as grant dates for SafeNet option grants. By selecting these highly favorable dates and causing options to be granted on dates when she knew they would be "in-the-money"-- that is, the exercise price of the options was lower than the market price of the stock on the date the options were granted -- Argo created an opportunity for herself and others at SafeNet to reap substantial profits. Argo then backdated documents to conceal from SafeNet's investors and outside auditors that SafeNet was issuing in-the-money option grants. Argo as well as other employees, officers and directors reaped substantial profits and other financial benefits from this scheme.

3.    In connection with this scheme, from at least the fourth quarter of 2000 through the second quarter of 2006, Argo prepared and/or reviewed proxy statements, periodic reports, and Securities Act registration statements that she knew, or was reckless in not knowing, contained materially false and misleading statements and omissions concerning SafeNet's financial condition and options granting practices. These statements created the false impression that SafeNet did not grant in-the-money options to its employees and was properly accounting for its options grants. Also, because SafeNet was not properly accounting for the in-the-money options it granted, from the fourth quarter of 2000 through the second quarter of 2006, SafeNet's proxy statements, periodic reports, and Securities Act registration statements misled investors because they materially understated the Company's compensation expenses and materially misstated its net income or loss, and earnings per share.

4.    By engaging in the conduct described above, defendant Argo, among other things, violated the antifraud provisions of the federal securities laws, falsified SafeNet's books and records, and caused SafeNet to issue false and misleading financial reports. Argo also aided and

abetted SafeNet's reporting and proxy violations. Specifically, defendant Argo violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3], and aided and abetted SafeNet's violations of Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 14(a) [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-13, and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13 and 240.14a-9]. Unless enjoined, defendant Argo will likely commit such violations in the future. Argo should be enjoined from violating the aforesaid provisions and rules, ordered to disgorge any ill-gotten gains or benefits derived as a result of her violations, as well as prejudgment interest thereon, and ordered to pay appropriate civil money penalties. In addition, defendant Argo should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)].

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. The defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged herein.

6.     Venue is proper in the District of Columbia pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

## THE DEFENDANT

7.     Defendant Carole Argo, age 45, is a resident of Baltimore, Maryland.  Argo was SafeNet's president and chief operating officer ("COO") from June 2004 until October 2006, when she resigned as an officer of the Company.  From April 2006 until her resignation in October 2006, Argo also acted as SafeNet's interim CFO.  From June 1999 through June 2004, she served as SafeNet's senior vice president and chief financial officer ("CFO").  Prior to joining SafeNet, Argo served as the CFO of a public company for approximately one year and, prior to that, served as the vice president of finance and operations and controller of a privately held company for eight years.  Argo is a certified public accountant ("CPA") who has seven years of public accounting experience, including working as an audit manager at a Big Four accounting firm.

## SAFENET, INC.

8.     SafeNet, Inc., which previously did business as Information Resource Engineering, Inc., is a Delaware corporation, with its headquarters in Belcamp, Maryland. SafeNet produces information security software products.  During the relevant period, the Company's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and listed on the NASDAQ National Market under the symbol "SFNT."  In 2006, the NASDAQ National Market became an "exchange", and as a result, the Company's common stock was registered under Section 12(b), and traded on the NASDAQ National Market until April 12, 2007, when SafeNet was taken private as part of a private equity transaction.  For the

year ended 2005, SafeNet reported revenues of $263 million and net income of $3 million.

SafeNet reported annual revenue of $25.3 million, $16.5 million, $32.2 million, $66.2 million,

and $201 million, and annual net income or loss of $7.2 million, ($109,000), ($780,000), ($6.1

million), and $2.18 million, for fiscal years 2000 through 2004, respectively.

## FACTS

**A.    Accounting For Options Under Generally Accepted Accounting Principles**

9.    Generally Accepted Accounting Principles ("GAAP") are standards, rules and

conventions that are established by the Financial Accounting Standards Board and other related

bodies. Under Commission regulations, financial statements that are filed with the Commission

must be prepared in conformity with GAAP.

10.    SafeNet was required to comply with the GAAP standards governing accounting

for stock options. The relevant accounting standard pertaining to options accounting was

Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB

25"), which was applicable to the company throughout the period during which the illegal

conduct alleged herein occurred. APB 25 required companies to record an expense for the

"intrinsic" value of an employee stock option on its "measurement date." A stock option has

intrinsic value if the exercise price of the option is lower than the market price of the underlying

stock on the measurement date. The measurement date is the date upon which the company,

acting through a person or entity with the requisite legal authority, has determined the exercise

price of the option, the number of options, and the name of the option recipient. Under APB 25,

a company that grants an employee in-the-money options is required to calculate compensation

expense as the difference between the exercise price and the market price of the stock on the

measurement date and recognize that expense in the income statement over the vesting period of the option grant.

11.    Although SafeNet routinely granted its employees in-the-money options, Argo knowingly or recklessly failed to cause SafeNet to record the attendant compensation expenses as required by APB 25.

12.    From at least the fourth quarter of 2000 through the second quarter of 2006, SafeNet falsely represented, in reports filed with the Commission, that it complied with APB 25 and that it had properly accounted for its option grants using the intrinsic value method prescribed by APB 25.  As SafeNet's CFO, and later its interim CFO, Argo signed annual and quarterly reports that falsely certified that SafeNet had complied with APB 25 and had properly accounted for option grants.

**B.    SafeNet's Option Granting Process**

13.    When Argo assumed the duties as CFO of SafeNet, several independent SafeNet directors comprised the Compensation Committee, which among other things was authorized to award stock options under SafeNet's stock option plans.  During 1999 and the first half of 2000, the Compensation Committee primarily awarded options grants when it convened during regularly scheduled meetings of SafeNet's Board of Directors.  Sometime after mid-2000, SafeNet amended its procedure for granting options and allowed a grant to be awarded by the unanimous written consent of the Compensation Committee.

14.    Pursuant to SafeNet's stock options plan in effect during this period, the "grant date" was defined as "the date on which the [Compensation] Committee formally acts to grant an Award to a grantee or such other date as the [Compensation] Committee shall so designate at the time of taking such formal action."  However, if the Compensation Committee granted in-the-

6

money options as a result of selecting an historical date as the "grant date," GAAP required

SafeNet to calculate compensation expense for the in-the-money portion of the options and

amortize it over the vesting period of the options.

15.     After Argo began working at SafeNet, Argo and SafeNet's then chief executive

officer ("Former CEO") made recommendations to the Compensation Committee, concerning

the specific employees or executives who should receive stock options and the number of options

to be granted. The Compensation Committee would then award the grants, if appropriate.

16.     In May 2000, Argo and the former CEO drafted and sent a memorandum to the

Compensation Committee requesting that it approve a standardized option plan that would

permit SafeNet's management to grant stock options without the necessity of obtaining the

approval of the Compensation Committee. The proposed standardized plan, which applied to

new hires, promoted employees, and employees receiving "refresher grants" (grants issued to

keep compensation levels equitable among employees), required the Compensation Committee

to establish standard option grants for each category of employees. In this memorandum, Argo

and the former CEO stated that, because the accounting rules concerning stock option

compensation had become more stringent, SafeNet needed to establish procedures to ensure that

stock options were issued "without a charge to compensation expense." The accounting changes

referred to in the memo related to Financial Interpretation No. 44 ("FIN 44"), which was issued

by the Financial Accounting Standards Board in March 2000 and became effective July 1, 2000.

FIN 44 is an interpretation of APB 25, and addressed issues relating to the expensing of stock

options and embodied the current view of GAAP treatment of accounting for stock option

compensation.

17.     On July 19, 2000, SafeNet's Board of Directors adopted a uniform option program for newly hired employees and employees receiving promotions that delegated to SafeNet's CEO, CFO, and Secretary, the authority to issue stock options in accordance with specific guidelines specified by the Board. Any stock option award that did not comply with the guidelines of the uniform option program required the written unanimous consent of the Compensation Committee.

18.     Also, on July 19, 2000, SafeNet's Board of Directors approved an annual stock option program for employees receiving so-called "refresher" or "replenishment" grants and apparently delegated to SafeNet's CEO, CFO, and Secretary the authority to issue these stock options in accordance with the guidelines specified by the Board. Any replacement stock option award pursuant to this program that did not comply with the guidelines of the annual option program required the written unanimous consent of the Compensation Committee.

19.     The Board of Directors, however, did not delegate to SafeNet's CEO, CFO or Secretary the authority to grant stock options to themselves or other senior officers. Consequently, such grants continued to be awarded solely by the Compensation Committee.

20.     Notwithstanding the delegations of authority described in paragraphs 17 and 18 above, Argo routinely submitted proposed stock option grants to the Compensation Committee to have the options granted by the committee.

## C.    **Argo Directed the Backdating**

21.     Argo, in her capacity as SafeNet's CFO, was responsible for supervising SafeNet's stock option granting process, and obtaining the written consent of the Compensation Committee for stock option grants as necessary.

8

22.    Beginning not later than October 2000, Argo's practice was to direct an administrative assistant to prepare the written consent for the grant of a stock option by the Compensation Committee. Argo provided the administrative assistant with the pertinent information for the consents, including the name of the stock option recipient, the number of options to be granted, and the grant date to be used. To select the date to be used as the grant date, Argo, or an administrative assistant acting at Argo's direction, looked back to find dates when SafeNet's stock had closed at or near the low for that quarter. After Argo reviewed and approved the draft consents, either Argo or the administrative assistant acting on Argo's instructions, forwarded the consents to the Compensation Committee to have the options granted. The purported grant date for stock option grants was typically placed at the top of the written consents, with the consents stating that certain individuals named in the consents or in an attachment to the consents were granted a specified number of options as of the particular date at the top of the consents. In addition, the consents typically stated that the exercise price for the option was "the last sale price of the Company's Common Stock on the NASDAQ National Market, on the above listed date."

23.    The dates on the written consents submitted to the Compensation Committee were selected by Argo, or by an administrative assistant at Argo's direction, because they were historical dates on which the closing price of SafeNet's stock was particularly low, often at or near the quarterly low closing price for the stock. These backdated consents, prepared by Argo, or at her direction, created the false appearance that the dates reflected at the top of the consents were the actual dates when the options were granted by the Compensation Committee.

24.    Argo did not disclose to the Compensation Committee that she routinely looked back and chose dates that coincided with particularly low stock prices as the grant dates for option grants.

25.    During the period from the fourth quarter of 2000 through the second quarter of 2004, at Argo's direction, numerous option grants were backdated and presented to the Compensation Committee in order to grant her, and other employees, in-the-money options at or near low prices for SafeNet's stock. Based on her illegal conduct, Argo was awarded a total of at least 98,000 in-the-money SafeNet options, at exercise prices that coincided with particularly low closing prices for SafeNet stock on each of the following dates: (i) October 11, 2000 (13,000 options at an exercise price of $24.12--the lowest closing price for SafeNet stock for that quarter); (ii) October 1, 2001 (45,000 options at an exercise price of $5.85--the lowest closing price for that quarter); (iii) February 27, 2003 (30,000 options at an exercise price of $16.47-- the lowest closing price for that quarter); and (iv) July 17, 2003 (10,000 options at an exercise price of $31.35--one of the lowest closing prices for that quarter). Argo's illicit conduct also resulted in other senior executives and employees being awarded at least 840,000 in-the-money stock options, at exercise prices that coincided with particularly low closing prices for SafeNet stock on at least each of the following dates: October 11, 2000, April 3, 2001, October 1, 2001, October 8, 2002, February 27, 2003, and July 17, 2003.

26.    Argo knowingly or recklessly failed to cause SafeNet to record the requisite compensation expense for these in-the-money option grants.

27.    In June 2004, Argo was promoted to president and COO of SafeNet, and a New CFO ("New CFO") was hired. In an e-mail dated September 15, 2004, Argo informed the New CFO of her past practice of backdating option grants as follows:

> Our past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date. We then send the unanimous consent to the comp committee and the options are approved. I think this is a good practice because of the volatility of our stock price. Who wants to have an option priced on your start date and then have the option underwater a month later when you are notified of the award price.

After Argo's promotion, the practice of backdating option grants continued.

28. During the period in which Argo engaged in the backdating of options grants, Argo had frequent interactions with SafeNet's independent auditors, and discussed various option accounting issues with them. However, Argo never disclosed to SafeNet's independent auditors that she routinely looked back to find favorable dates that coincided with particularly low stock prices to use as the grant dates for option grants. Nor did she disclose to SafeNet's auditors that the date at the top of the consents signed by the Compensation Committee was not the date on which the committee had granted the options.

29. Beginning in the fourth quarter of 2000 through the second quarter of 2004, and in her capacity as SafeNet's Interim CFO beginning in the first quarter of 2006, Argo signed management representation letters that asserted to SafeNet's auditors that Argo was unaware of any ongoing fraud at SafeNet. Argo knew or was reckless in not knowing that such misrepresentations were false and misleading.

**D.    Argo Benefited from the Backdating Scheme**

30. Argo directly benefited from her backdating scheme when she obtained in-the-money option grants from SafeNet. The in-the-money portion of these backdated options that Argo received was worth approximately $960,000 at the time of the grants to Argo. Each of Argo's option grants had a four-year vesting period with twenty-five percent of the option vesting each year.

31.    During 2004 and 2005, Argo exercised 18,500 options from a backdated grant that was purportedly awarded on October 1, 2001. Although Argo did not sell these shares, she realized a benefit of approximately $236,000 upon the exercise of these options, as the shares were purchased from SafeNet at a discount from the price she should have paid had the exercise price corresponded to the true measurement date for that grant.

32.    From 2000 through 2004, Argo received performance bonuses that included approximately $650,000 in cash. However, upon information and belief, had Argo disclosed to the Board that she was involved in backdating stock options and not recording the requisite compensation expense for the resulting in-the-money option grants, Argo would not have been awarded these bonuses. As a result, Argo received performance bonuses to which she was not entitled.

33.    In addition, Argo benefited from her on-going options backdating scheme when, in December 2004, Argo sold 30,000 SafeNet shares at $36 per share, for total proceeds of approximately $ 1.1 million. At the time Argo sold the stock, SafeNet was not properly accounting for, or reporting in its financial statements, the compensation expense associated with the in-the-money options it had granted Argo and others.

E.    **Specific Examples of Backdated Options**

34.    From 2000 through 2005, Argo directed, participated in, or was aware of, the granting of undisclosed, in-the-money options to herself and others by selecting dates when SafeNet's stock had closed at particularly low prices, and then backdating the stock option grants to coincide with these favorable dates. The written consents that Argo provided to the Compensation Committee for execution did not reflect the date on which Argo chose the historical date to be used as the grant date or the date on which the Compensation Committee

12

executed the written consent. Instead, they reflected the historical dates that Argo had chosen after looking back to identify dates on which the price of SafeNet's stock was at or close to its lowest point for the quarter. By engaging in this scheme, Argo was able to conceal from investors that SafeNet was not recording material compensation expenses and was materially misstating its financial results.

### 1. The October 1, 2001 Grant

35.    During the summer of 2001, the Compensation Committee was involved in on-going discussions with the Former CEO concerning the number of options that he would receive in connection with his new employment contract. The Former CEO had requested that the Compensation Committee award him 200,000 options as part of his new employment contract. However, the Compensation Committee decided to grant the Former CEO only 50,000 options as part of his new employment agreement.

36.    In late October 2001, Argo, or an administrative assistant acting at Argo's instruction, looked back and selected October 1, 2001, the date when SafeNet's stock had closed at its lowest price during that quarter, to use as the grant date for option awards to herself and the Former CEO. On or about October 25, 2001, Argo, or an administrative assistant acting at Argo's instruction, sent a written consent, dated October 1, 2001, to the Compensation Committee to award 50,000 options to the Former CEO and 20,000 options to Argo, both at the exercise price of $5.85, the closing price for SafeNet's stock on October 1, 2001. The exercise price of $5.85 was extremely advantageous to Argo and the Former CEO because, on October 25, 2001, SafeNet's stock had closed at $9.85 per share.

37.    On or about October 28, 2001, the Compensation Committee executed the written consent granting these stock options to the Former CEO and to Argo at exercise prices of $5.85 per share.

38.    The Former CEO was dissatisfied that he had only been awarded 50,000 options, and he refused to sign his new contract. As a compromise, on or about December 12, 2001, the Compensation Committee agreed to grant the Former CEO an additional 100,000 options, as an inducement for him to execute a new employment contract with SafeNet. On December 12, 2001, the Former CEO agreed to sign his new employment contract, and the board approved the Former CEO's new contract. Argo attended this board meeting.

39.    The contract, which was also dated December 12, 2001, stated that the Former CEO had been "issued 150,000 incentive stock options" and that the options "were issued at the fair market value of [SafeNet's] common stock as of the date of the grant." The 150,000 options referred to in the contract included the 50,000 options that the Compensation Committee had agreed to grant to the Former CEO on or about October 28, 2001.

40.    On or about December 12, 2001, the Compensation Committee also agreed to grant an additional 25,000 options to Argo.

41.    On or about January 4, 2002, Argo again selected October 1, 2001, the date when SafeNet's stock had closed at its lowest price during the fourth quarter 2001, to use as the grant date for option awards to herself, the CEO and another executive. On January 4, 2002, Argo requested that the Compensation Committee execute a written consent, dated October 1, 2001, granting 150,000 options to the Former CEO, 45,000 options to Argo, and 10,000 options to another SafeNet executive under Argo's supervision. On January 4, 2002, the closing price of SafeNet stock was $18.65 per share.

14

42.     In a cover letter accompanying these consents, Argo explained to the Compensation Committee that the new consent would "modify" the initial grants made to her and the Former CEO during the prior quarter.

43.     On January 4, 2002, the Compensation Committee executed the written consents that Argo had provided to them. Thus, these option grants were awarded on January 4, 2002, three months after the purported grant date of October 1, 2001 that was stated in the written consents provided by Argo. Because these option grants were awarded on January 4, 2002, when SafeNet's stock price closed at $18.65, but were backdated to October 1, 2001, when the closing stock price was $5.85, Argo and the Former CEO received option grants that were in-the-money by approximately $576,000 and $1,920,000, respectively.

44.     Argo took additional steps to conceal that the January 4, 2002, stock option grant to the Former CEO had been backdated. The Compensation Committee provided Argo with a copy of the signed minutes for the December 12, 2001 Compensation Committee meeting. In the section dealing with the Former CEO's option grant, the minutes stated, "As a signing bonus, the Committee recommended 100,000 options." Argo made handwritten changes to the document, so that the memo read as follows: "As a signing incentive, the Committee previously approved a stock option grant for 100,000 options." (emphasis added). Argo's revision was incorporated into the final version of the minutes that was signed by the members of the Compensation Committee. Argo's changes to the minutes created the appearance that the 100,000 stock options granted to the Former CEO had been awarded by the Compensation Committee prior to January 4, 2002.

45.     Argo knew, or was reckless in not knowing, that the grants described above, including her grant, had been backdated to take advantage of a historically low closing stock

price, and were "in-the-money" as of the grant date. Argo further knew or was reckless in not knowing that SafeNet was required to recognize a substantial compensation expense for the in-the-money portion of these options. SafeNet did not record a compensation expense for this option grant.

### 2. The October 8, 2002 Grant

46.     On or about October 24, 2002, the Compensation Committee executed a written consent granting the Former CEO 100,000 stock options to replace options that he had inadvertently permitted to expire. However, the written consent that Argo provided to the Compensation Committee for signature was dated October 8, 2002, and granted the former CEO the 100,000 stock options at an exercise price of $13.75 -- the closing price for SafeNet's stock on October 8, 2002. SafeNet's stock price closed at $18.75 per share on October 24, 2002. Consequently, by providing the Compensation Committee with a backdated written consent awarding these options, Argo caused the Former CEO to receive an in-the-money benefit worth approximately $500,000.

47.     Argo knew, or was reckless in not knowing, that this grant to the Former CEO awarded him in-the-money options and required SafeNet to record a compensation expense. SafeNet did not record any compensation expense related to this grant.

### 3. The February 27, 2003 Grant

48.     On or about January 2, 2003, the Former CEO provided the Compensation Committee with his recommendations for the number of options to be awarded to SafeNet's senior executives. On or about January 2, 2003, in response to these recommendations, the Compensation Committee approved the granting of 30,000 options to Argo and 40,000 options to a senior vice president ("SVP").

49.    On or about January 8, 2003, the Compensation Committee reported to SafeNet's Board that it had approved all proposed compensation awards for executive officers. These awards included a grant of 100,000 stock options to the Former CEO.

50.    In a January 14, 2003 e-mail, an employee in SafeNet's finance department asked Argo whether he should "put together stock option agreements for [the Former CEO], [the SVP] and [Argo]." He then added, "What did you have in mind for these agreements (dates, prices, terms, etc.)?" In an e-mail dated January 14, 2003, Argo responded, "No we will wait on pricing."

51.    Upon information and belief, at a later point in time, Argo, or an administrative assistant acting at Argo's direction, looked back and selected February 27, 2003, the date when SafeNet's stock had closed at the lowest price for the first quarter of 2003, to use as the grant date for the award of 30,000 options to herself, 100,000 options to the Former CEO and 40,000 options to the SVP. The exercise price for these options was $16.47 per share, the closing price of SafeNet's stock on February 27, 2003.

52.    In connection with these option grants to Argo, the Former CEO and the SVP, SafeNet has no written consents or minutes reflecting that the Compensation Committee approved the exercise price of $16.47.

53.    Argo, the Former CEO and the SVP each signed an option agreement for these awards. To disguise the fact that her options had been awarded after February 27, 2003, Argo backdated her option agreement when she signed it. Specifically, in the date line next to her signature, Argo wrote in "2/27/03" as the date. Argo's backdating of her agreement was intended to, and did, create the false appearance that she had actually signed her option agreement on February 27, 2003.

54.     Although Argo's option agreement specified that she was awarded 30,000 options, SafeNet's option tracking system reflected that Argo had been awarded 40,000 options.

55.     Because these option grants were backdated to February 27, 2003, when the closing stock price was $16.47, Argo, the Former CEO, and the SVP received option grants that were in-the-money by at least approximately $120,600, $402,000, and $160,800, respectively.

56.     Argo knew, or was reckless in not knowing, that the grants described above, including her grant, had been backdated to take advantage of a historically low closing stock price, and were "in-the-money" when they were awarded. Argo further knew or was reckless in not knowing that SafeNet was required to recognize a substantial compensation expense for the in-the-money portion of these options. SafeNet did not record a compensation expense for these option awards.

### 4. The May 1, 2003 Grant

57.     Sometime in early 2003, the Former CEO and Argo asked a member of SafeNet's board (the "Board Member") to serve as a consultant to the Company to assist in identifying potential targets for acquisitions. On or about April 21, 2003, SafeNet's Board approved a consulting agreement with the Board Member and, along with cash compensation, granted him 50,000 options at an exercise price equal to the stock's closing price on the effective date of the agreement.

58.     The agreement became effective on May 1, 2003, and the Board Member began providing consulting services to SafeNet. Shortly thereafter, pursuant to the consulting agreement, the Board Member received 50,000 options at an exercise price of $23.84, the closing price of SafeNet's stock on May 1, 2003.

59.    On June 13, 2003, SafeNet filed with the Commission a registration statement on Form S-3, signed by Argo that disclosed the Board Member's consulting agreement. Subsequently, SafeNet submitted a copy of the consulting agreement as an exhibit to a Form S-3 amendment that was filed with the Commission on June 24, 2003, which was also signed by Argo.

60.    Because SafeNet granted this board member 50,000 options as a consultant, and not as an employee, GAAP required that SafeNet calculate compensation expense for the fair value of the 50,000 options, and recognize the compensation expense over the vesting period of the options grant, if any.

61.    On or about July 2, 2003, Argo requested that SafeNet's outside auditors calculate the compensation expense that the Company would need to record as a result of the options grant to the consultant. The auditors informed Argo that SafeNet should record a compensation expense of at least $525,000. Upon learning of the amount of the charge, Argo told the audit partner responsible for SafeNet's audit that SafeNet did not want to enter into a relationship with the Board Member that would result in such a large compensation expense.

62.    Shortly thereafter, Argo and the Former CEO asked the Board Member to agree to work as a part-time employee of SafeNet, instead of as a consultant. The Board Member agreed to this change.

63.    On July 7, 2003, SafeNet executed an employment agreement with the Board Member that was backdated to May 1, 2003. The employment agreement stated:

> Confirming your discussions with [the Former CEO] and Carole Argo, I am pleased to offer you part-time employment beginning May 1, 2003, assisting SafeNet with strategic business development. . . . There will be a recommendation to the Board of Directors for the granting of an option to purchase 50,000 shares of SafeNet stock . . . These shares shall be vested on the grant date and are non-forfeitable."

64.    On July 9, 2003, SafeNet filed an amended Form S-3 with the Commission that was signed by Argo. The backdated employment agreement was attached as an exhibit to the amended Form S-3. The filing of the backdated agreement, coupled with SafeNet's disclosure that it had replaced the consulting agreement with an employment agreement, created the false impression that SafeNet had contemplated, and entered into, the employment agreement on or before May 1, 2003, rather than July 7, 2003. SafeNet backdated the Board Member's employment agreement to avoid recognizing the compensation expense arising from the granting of the 50,000 stock options to the Board Member during the previous quarter. Because SafeNet had already entered into the consulting relationship during the previous quarter, GAAP required SafeNet to recognize compensation expense during the prior quarter.

65.    Argo knew or was reckless in not knowing that, by revoking the Board Member's consulting agreement and entering into a new employment agreement, SafeNet created a new measurement date for the 50,000 share option grant, and pursuant to GAAP, SafeNet was required to record a compensation charge of at least $360,000, reflecting the difference between the closing price of SafeNet stock on May 1, 2003 and the closing price on July 7, 2003. Argo knowingly or recklessly failed to cause SafeNet to record the requisite compensation expense.

**5. The July 17, 2003 Grant**

66.    On or about September 15, 2003, using the benefit of hindsight, Argo selected July 17, 2003, a date when SafeNet's closing stock price was near a low point for that quarter, as the grant date for numerous option awards to SafeNet employees including herself. On September 15, 2003, Argo notified the Compensation Committee, via e-mail, that she was forwarding consents for the approval of new hire stock option grants and annual stock option grants for the third quarter, and requested that the Compensation Committee approve the grants

as soon as possible. The grants included a grant to Argo of 10,000 options which had been recommended by the Former CEO.

67.    On or about September 15, 2003, Argo provided the Compensation Committee with these written consents, dated July 17, 2003. The consents further stated that the members of the Compensation Committee "do hereby consent to the granting of a stock option on July 17, 2003." On September 16, 2003, the Compensation Committee granted these stock options to Argo and the other SafeNet employees by executing the consents provided by Argo.

68.    On July 17, 2003, the closing price of SafeNet's stock was $31.35, which was one of the lowest closing prices for that quarter, while the closing price of SafeNet's stock on September 16, 2003 was $38.85. Consequently, the stock options Argo received as a result of the September 16th grant were in-the-money by approximately $75,000 on the day they were granted to her.

69.    As SafeNet's CFO, Argo knew, or was reckless in not knowing, that the stock options awarded on September 16, 2003 had been backdated and required SafeNet to record a compensation expense for them. SafeNet did not record a compensation expense for these option awards.

**F.    SafeNet's Materially False and Misleading Statements and Disclosures**

**1.    SafeNet's Materially False and Misleading Statements on Forms 10-Q and 10-K**

70.    Argo reviewed and signed SafeNet's annual reports on Form 10-K for fiscal years ended 2000 through 2003 and quarterly reports on Form 10-Q for the fiscal quarters ended March 31, 2001 through March 31, 2004. Upon information and belief, from June 2004 through October 2006 when she served as SafeNet's president and COO, Argo reviewed certain of SafeNet's quarterly reports on Form 10-Q filed during that period, and SafeNet's annual reports

21

on Form 10-K for years ended 2004 and 2005, but did not sign them. Argo also reviewed draft earnings releases prior to their issuance by SafeNet during the period from the fourth quarter of 2000 through the first quarter of 2006. Argo knew, or was reckless in not knowing, that the quarterly reports on Form 10-Q and the annual reports on Form 10-K, as well as the draft earnings releases for these periods that she reviewed and/or signed, contained materially false and misleading statements and disclosures. Argo's stock option backdating scheme caused each of SafeNet's Forms 10-K for fiscal years ended 2000 through 2005, and each of SafeNet's Forms 10-Q for the period from the fourth quarter of 2000 through the first quarter 2006, to materially understate SafeNet's compensation expenses and materially misstate the Company's net income or loss, because SafeNet failed to properly expense the in-the-money stock option grants during that period as required by APB 25.

71.    As a direct result of Argo's fraudulent conduct, SafeNet failed to record material compensation expenses for option grants made during fiscal years ended 2000 through 2005. Consequently, SafeNet's reported financial results for this period were materially misstated. For example, upon information and belief, for fiscal years 2000 through 2005, SafeNet's annual net income or loss was materially misstated by approximately 4 percent, 32 percent, 25 percent, 27 percent, 400 percent, and 200 percent, respectively.

72.    Additionally, from fiscal years ended 2000 through 2005, SafeNet stated in its annual reports that it accounted for its five stock-based employee compensation plans using the intrinsic value method prescribed by APB Opinion No. 25. Using this method, the company stated that no stock-based compensation is reflected in net income, as "all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the *date of grant*." Argo knew, or was reckless in not knowing, that these statements were

materially false and misleading in each of these years because, pursuant to Argo's backdating scheme, SafeNet had granted stock options at prices that were below fair market value on the date of grant. As alleged previously, APB 25 required SafeNet to record compensation expense for options that were in-the-money on the date of grant.

73.    In early 2006, when Argo assumed the position of interim CFO, she prepared, reviewed and signed several amended filings, including SafeNet's Form 10-Q's for the second and third quarters of 2005. Argo knew, or was reckless in not knowing, that these filings were materially false and misleading because they included materially false and misleading historical financial information from fiscal years ended 2004 and 2005.

74.    Argo also signed certifications in connection with SafeNet's public filings for fiscal years ended 2002 and 2003 on Forms 10-K, and Forms 10-Q for fiscal quarters ended September 30, 2002 through March 31, 2004 and amended Form 10-Q filings for the periods of June 30, 2005 and September 30, 2005. Argo certified that these filings did not contain any material misstatements or omit material information and that the reports fairly presented in all material respects SafeNet's financial condition and results of operations. Argo knew, or was reckless in not knowing, that these certifications were materially false and misleading. SafeNet's financial statements filed for those years did not fairly present SafeNet's financial condition because SafeNet failed to properly account for the in-the money option grants and, consequently, misstated its net income or loss, and earnings per share.

### 2.    SafeNet's Materially False and Misleading Proxy Statements

75.    As SafeNet's corporate secretary, Argo prepared and signed SafeNet's 2000 through 2003 proxy statements, which were filed with the Commission. Argo knew, or was

reckless in not knowing, that these filings contained materially false and misleading statements and material omissions concerning stock option grants to Argo and other SafeNet officers.

76.    For example, these proxy statements described SafeNet's option grants to senior executives including Argo in the following manner: "[n]o gain to the options is possible without stock price appreciation, which will benefit all shareholders. If the stock price does not increase above the exercisable price, compensation to the named executive will be zero." These statements were false and misleading in light of the company's on-going backdating scheme, which resulted in Argo and other executives receiving in-the-money options. The proxy statements also failed to disclose the potential, additional stock-based compensation to Argo and other SafeNet officers as a result of being granted in-the-money options.

### 3.    Argo's Materially False and Misleading Statements to SafeNet's Independent Auditors

77.    From the fourth quarter of 2000 through the second quarter of 2004, in her capacity as SafeNet's CFO, and beginning in the first quarter of 2006, Argo signed management representation letters that, among other things, asserted to SafeNet's auditors that Argo was unaware of any ongoing fraud at SafeNet. Argo knew, or was reckless in not knowing that such misrepresentations were false and misleading. During this period, Argo also concealed from SafeNet's auditors that SafeNet had a practice of (i) selecting historical dates that coincided with particularly low stock prices to use as grant dates for option grants, and (ii) backdating the executed consents to disguise the granting of these in-the-money options.

### 4.    SafeNet's Books and Records and Internal Accounting Controls

78.    As SafeNet's CFO, Argo was responsible for, among other things, ensuring that SafeNet properly accounted for option grants.

24

79.     As a result of Argo's options backdating scheme, and the steps she took to conceal it, Argo caused SafeNet's books and records to falsely and inaccurately reflect, among other things, the dates of option grants, the Company's stock-based compensation expenses, and the Company's financial condition. Additionally, Argo circumvented SafeNet's internal accounting controls by causing SafeNet to record in its option tracking system inaccurate grant dates based on the dates reflected in the backdated consents. By the conduct alleged above, Argo also failed to implement a system of internal accounting controls sufficient to provide assurances that stock option grants were recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP.

**G.     Argo Failed to File Section 16 Ownership Reports**

80.     Section 16 of the Exchange Act, requires that officers, directors, and persons who own more than ten percent of the outstanding shares of a public company's common stock, file reports of ownership and changes in ownership with the Commission. Under section 16, as amended by section 403 of the Sarbanes-Oxley Act of 2002, insiders are required to report changes in their beneficial ownership of company securities on Form 4 within two business days of the trade or other event requiring the filing.

81.     From 2003 through 2005, Argo failed to file Forms 4 with the Commission to disclose her option grants from SafeNet. During that time, Argo, as a senior officer of a public company, was required to disclose option grants within two days of the date of grant, by filing a Form 4. Specifically, Argo failed to file Forms 4 disclosing options grants that she received with purported grant dates of February 27, 2003, July 17, 2003, May 19, 2004, June 1, 2005, and September 29, 2005.

## FIRST CLAIM
### Violations of Securities Act Section 17(a)

82.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 81 above.

83.    Defendant Argo directly or indirectly, knowingly, or recklessly in the offer or sale of SafeNet securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of SafeNet securities.

84.    By engaging in the conduct alleged above defendant Argo violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM
### Violations of Exchange Act Section 10(b) and
### Exchange Act Rule 10b-5 Thereunder

85.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 84 above.

86.    Defendant Argo, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged

in acts, transactions, practices, or courses of business which operated or would operate as a fraud

or deceit upon any person, in connection with the purchase or sale of securities.

87.    By engaging in the conduct described above, defendant Argo violated Exchange

Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM
#### Violations of Exchange Act Section 14(a) and
#### Exchange Act Rule 14a-9 Thereunder

88.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 87 above.

89.    Defendant Argo, by the use of the mails or by any means or instrumentality of

interstate commerce or of any facility of a national securities exchange or otherwise, knowingly

or recklessly, solicited by means of a proxy statement, form of proxy, notice of meeting or other

communication, written or oral, containing statements which, at the time and in light of the

circumstances under which they were made, were false and misleading with respect to material

facts, or omitted to state material facts necessary in order to make the statements therein not false

or misleading or necessary to correct statements in earlier communications with respect to the

solicitation of the proxy for the same meeting or subject matter which was false or misleading.

90.    By engaging in the conduct alleged above, defendant Argo violated Exchange Act

Section 14(a) [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

### FOURTH CLAIM
#### Violations of Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1

91.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 90 above.

92.     Defendant Argo knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

93.     Defendant Argo, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

94.     By engaging in the conduct alleged above, defendant Argo violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM
### Violations of Exchange Act Rule 13b2-2

95.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 94 above.

96.     Defendant Argo, directly or indirectly, (i) made, or caused to be made, materially false or misleading statements or (ii) omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

97.     By engaging in the conduct alleged above, the defendant Argo violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM
### Violations of Exchange Act Rule 13a-14

98.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 97 above.

99.     Defendant Argo signed false certifications in SafeNet's annual reports filed for 2002 and 2003, and in quarterly reports filed for the second quarter of 2002 through the first quarter of 2004, and in amended interim reports for the second and third quarters of 2005, filed in 2006.  Among other things, Argo certified that she had reviewed each of these reports and, based on her knowledge, these reports, (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) included financial statements and other financial information which fairly presented, in all material respects, SafeNet's financial condition, results of operations and cash flows.  These representations were false, as Argo knew that the filings contained material misstatements and omissions concerning SafeNet's option granting practice and its financial results.

100.     By engaging in the conduct alleged above, the defendant Argo violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SEVENTH CLAIM
### Violation of Exchange Act Section 16(a) and Rule 16a-3 Thereunder

101.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 100 above.

102.     Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] require officers, directors and beneficial owners of more than ten percent of any class of equity security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] to file periodic reports disclosing any change of beneficial ownership of those securities.

103.    Defendant Argo failed to file with the Commission Forms 4 to disclose her option grants within two days of the grant date.

104.    By engaging in the conduct alleged above, the defendant Argo violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. § 240.16a-3].

### EIGHTH CLAIM
### Aiding and Abetting SafeNet's Violations of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1 and 13a-13 Thereunder

105.    The Commission realleges and incorporates by reference Paragraphs 1 through 104 above.

106.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1 and 13a-13 [17 C.F.R. §§ 240.13a-1 and 240.13a-13] thereunder, require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-12] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

107.    SafeNet violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

108.    By engaging in the conduct alleged above, defendant Argo knowingly provided substantial assistance to SafeNet's violations of the aforementioned provisions, thereby aiding and abetting SafeNet's violations of the Exchange Act section 13(a) [15 U.S.C. § 78m(a)] and

Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### NINTH CLAIM
#### Aiding and Abetting SafeNet's
#### Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)

109.    The Commission realleges and incorporates by reference Paragraphs 1 through 108 above.

110.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets. Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

111.    SafeNet violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

112.    By engaging in the conduct alleged above, defendant Argo knowingly provided substantial assistance to SafeNet in its violations of the aforementioned provisions, thereby aiding and abetting SafeNet's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays that this Court:

a)    permanently enjoin defendant Argo from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a) and 16(a) of the Exchange Act [15

U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3] thereunder, and from aiding and abetting violations of Section 13(a), 13(b)(2)(A), 13(b)(2)(B) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-13 and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13 and 240.14a-9];

b) order defendant Argo to disgorge, with prejudgment interest, all ill-gotten gains, compensation, and benefits by virtue of the conduct alleged herein;

c) pursuant to Securities Act Section 20(a) [15 U.S.C. § 77t(a)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], order defendant Argo to pay civil money penalties;

d) pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], prohibit defendant Argo from acting as officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)];

e) grant any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(2)]; and

(h) grant such other relief as the Court may deem just and appropriate.

Dated: _8/1/07_

Respectfully submitted,

Jeffery Infelise (D.C. Bar # 456998)
Antonia Chion
Yuri B. Zelinsky
Michael A. Ungar
Alton O. Turner

Attorneys for Plaintiff

SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-4030
Tel: 202-551-4904
Fax: 202-772- 9362
E-mail:  infelisej@sec.gov

07-1397
JR

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

11001

## DEFENDANTS

Carole Argo

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jeffery Infelise
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4010 (202) 551-4904

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01397
Assigned To : Robertson, James
Assign. Date : 8/1/2007
Description: General Civil

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ⊙ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A–N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/ Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ⊙ E. General Civil (Other)     OR     ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

1

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

[15 U.S.C. § 77q(a)];[15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) 78p(a)]; [17 C.F.R. §§ 240.10b-5, 13a-14, 13b2-1, 13b2-2, 14a-9 and 16a-3] Securities Fraud

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ [_____] Check YES only if demanded in complai  JURY DEMAND: YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE 8/1/07    SIGNATURE OF ATTORNEY OF RECORD *Jeffery Infelise*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.